# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

MELVIN PORTER,

               Petitioner,

        -against-              ___-CV-___(___)

WILLIAM KEYSER, SUPERINTENDENT,
SULLIVAN CORRECTIONAL FACILITY,

               Respondent.

## MEMORANDUM OF LAW IN SUPPORT OF
## PETITION FOR WRIT OF HABEAS CORPUS

STEVEN R. BERKO (SB7713)
Attorney for Petitioner
THE LEGAL AID SOCIETY
Criminal Appeals Bureau
199 Water Street - 5th Floor
New York,  New York 10038
212-577-3904

December, 2017

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.....................................iii

PRELIMINARY STATEMENT......................................1

STATEMENT OF FACTS........................................3

    Introduction.........................................3

        The Mapp Hearing ..................................6

        The Defense Argument .............................13

        The Prosecutor's Argument ........................15

        The Hearing Court's Decision and Order ...........17

    The Trial...........................................21

    Verdict and Sentencing..............................21

    Summary of Petitioner's Argument to the Appellate
    Division............................................22

    Summary of the People's Argument to the Appellate
    Division............................................25

    The Appellate Division Decision.....................26

ARGUMENT

    COUNSEL'S FAILURE TO ADVANCE A MERITORIOUS
    SUPPRESSION ARGUMENT DEPRIVED PETITIONER OF
    HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE
    ASSISTANCE OF COUNSEL.  U.S. CONST., AMENDS.
    VI, XIV.............................................27

    Standard of Review..................................29

    The Strickland v. Washington Test...................30

    The suppression hearing.............................36

<u>Counsel's representation of petitioner failed
to meet an objective standard of reasonable-
ness and prejudiced petitioner</u> ....................... 49

<u>Application of AEDPA to petitioner's claim</u> .......... 54

<u>The state court proceedings resulted in
a decision that was contrary to Strick-
land</u>..........................................58

<u>Alternatively, the state court's deci-
sion was an unreasonable application of
Strickland</u>....................................60

CONCLUSION...........................................62

TABLE OF AUTHORITIES

FEDERAL CASES

Arizona v. Hicks, 480 U.S. 321 (1987).....................40

Berghuis v. Thompkins, 560 U.S. 370 (2010)...........48, 58

Brendlin v. California, 551 U.S. 249 (2007)..............42

Brown v. United States, 167 F.3d 109 (2d Cir. 1999).......32

Buck v. Davis, ___ U.S.___, 137 S.Ct. 759 (2017)..........34

Cornell v. Kirkpatrick, 665 F.3d 369 (2d Cir. 2011).......61

Cox v. Donnelly, 387 F.3d 193 (2d Cir. 2004).........33, 53

Cullen v. Pinholster, 563 U.S. 170, 131 S.Ct. (2015)..54, 57

Davis v. Mississippi, 394 U.S. 721 (1969)............46, 47

Dunaway v. New York, 442 U.S. 200 (1979).................47

Early v. Packer, 537 U.S. 3 (2002) (per curiam).......57, 59

Fagan v. Washington, 942 F.2d 1155 (7th Cir. 1991)........32

Flores v. Demskie, 215 F.3d 293 (2d Cir. 2000)...........33

Florida v. Bostick, 501 U.S. 429 (1991)..................42

Florida v. Royer, 460 U.S. 491 (1983).................43, 48

Harrison v. Cunningham, 512 Fed.Appx. 40 (2d Cir. 2013)...............................................53, 54

Henderson v. Sargent, 926 F.2d 706 (7th Cir. 1991).......33

Henry v. Scully, 918 F.Supp.693 (S.D.N.Y. 1995)...35, 36, 53

Hinton v. Alabama, ___ U.S.___, 134 S.Ct. 1081 (2014)................................................52, 61

Illinois v. Lafayette, 462 U.S. 640 (1983)...............48

Immigration and Naturalization Service v. Lopez-Mendoza, 468 U.S. 1032 (1984).............................46

Jones v. Stinson, 229 F.3d 112 (2d Cir. 2000).............30

Kimmelman v. Morrison, 477 U.S. 365 (1986)...........*passim*

Kyles v. Whitley, 514 U.S................................34

Lafler v. Cooper, 566 U.S. 156 (2012)....................59

Linstadt v. Keane, 239 F.3d 191 (2d Cir. 2001)........32, 35

Massillon v. Conway, 574 F.Supp.2d 381 (S.D.N.Y.
2008)....................................................54

Matire v, Wainwright, 811 F.2d 1430 (11th Cir. 1987)......33

Miller-El v. Cockrell, 537 U.S. 322 (2003)...............63

Minnesota v. Dickerson, 508 U.S. 366 (1993)..............40

Monroe v. Kuhlman, 433 F.3d 236 (2d Cir. 2006)...........60

Moore v. Secretary, 457 Fed. Appx. 170 (3d Cir.
2012)....................................................55

Murray v. Carrier, 477 U.S. 478 (1986)...................34

Panetti v. Quarterman, 551 U.S. 930 (2007)...............57

Pennsylvania v. Mimms, 434 U.S. 106 (1977)...............37

Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002)..........32

Rodriguez v. United States, 575 U.S. ___, 135 S.Ct.
1609 (2015)......................................38, 46, 48

Rosario v. Ercole, 601 F.3d 118 (2d Cir. 2010).......22, 31

Sibron v. New York, 392 U.S. 40, 88 S. Ct. 1889
(1968)...................................................45

Strickland v. Washington, 466 U.S. 668 (1984).........*passim*

Tennard v. Dretke, 542 U.S. 274 (2004)...................63

Terry v. Ohio, 392 U.S. 1 (1968).........................42

U.S. v. Cronic, 466 U.S.648 (1984).......................61

<u>United States</u> v. <u>Garcia-Beltran</u>, 389 F.3d 864 (9th Cir. 2004)................................................46

<u>United States</u> v. <u>Robinson</u>, 414 U.S. 218 (1973)...........49

<u>Walder</u> v. <u>United States</u>, 347 U.S. 62 (1954)..............47

<u>White</u> v. <u>Woodall</u>, ___ U.S. ___, 134 S.Ct. 1697 (2014)..................................................30

<u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510 (2003)....................55

<u>Williams</u> v. <u>Taylor</u>, 529 U.S. 362 (2000)..............*passim*

<u>Wilson</u> v. <u>Corcoran</u>, 562 U.S. 1 (2010) (per curiam).......57

<u>Wilson</u> v. <u>Mazzuca</u>, 570 F.3d 490 (2d Cir. 2009)...........................31, 32

<u>Wong Sun</u> v. <u>United States</u>, 371 U.S. 471 (1962).......48, 49

<u>Wren</u> v. <u>United States</u>, 517 U.S. 806 (1996)...........36, 37

<u>Ybarra</u> v. <u>Illinois</u>, 444 U.S. 85 (1979)..................45

STATE CASES

<u>People</u> v. <u>Abraham</u>, A.D. No. 11-08162.....................41

<u>People</u> v. <u>Baldi</u>, 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 4000.......................................59

<u>People</u> v. <u>Benevento</u>, 91 N.Y.2d 708, 674 N.Y.S.2d 629, 697 N.E.2d 584......................................59

<u>People</u> v. <u>Berrios</u>, 28 N.Y.2d 361 (1971)..................36

<u>People</u> v. <u>Caban</u>, 5 N.Y.3d 143, 800 N.Y.S.2d 70, 833 N.E.2d 213.......................................59

<u>People</u> v. <u>Edwards</u>, 95 N.Y.2d 486 (2000).................41

<u>People</u> v. <u>Garafolo</u>, 44 A.D.2d 86 (2d Dept. 1974).........36

<u>People</u> v. <u>Parris</u>, 83 N.Y.2d 342 (1994).................41

<u>People</u> v. <u>Pealer</u>, 20 N.Y.3d 447 (2013)..................37

People v. Porter, 138 A.D.3d 1148 (2d Dept. 2016).....*passim*

People v. Porter, 23 N.Y.3d 1030 (2016)...................27

People v. Porter, 28 N.Y.3d 1030 (2016) (Rivera, J.)....2, 5

People v. Robinson, 97 N.Y.2d 341 (2001).................37

People v. Turner, 840 N.E.2d 123 (N.Y. 2005).............59

People v. Turriago, 90 N.Y.2d 77 (1997)..................41

STATUTES

28 U.S.C. § 2254.....................................1, 29

28 U.S.C. § 2254(a).................................57, 62

28 U.S.C. § 2254(d)(1).......................29, 56, 57, 62

P.L. § 220.03...........................................1

P.L. § 265.02(1)........................................1

P.L. § 265.02(3)........................................1

P.L. § 265.03(1)(b).....................................1

P.L. § 265.03(3)........................................1

CONSTITUTIONAL PROVISIONS

U.S. CONST., Amend. VI..............................27, 29

U.S. CONST., Amend. XIV.............................27, 29

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

MELVIN PORTER,
                                        :
            Petitioner,                   MEMORANDUM OF LAW
                                        : IN SUPPORT OF
      -against-                           PETITION FOR A
                                        : WRIT OF HABEAS
WILLIAM KEYSER, Superintendent,           CORPUS
   Sullivan Correctional Facility,      :

            Respondent.                 : __-CV-_____ (___)

----------------------------------------X
```

## PRELIMINARY STATEMENT

Melvin Porter, an inmate at Sullivan Correctional Facility, in Fallsburg, New York, petitions for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This Memorandum of Law is submitted in support of Mr. Porter's petition.

Following a nonjury trial, petitioner was convicted, in Supreme Court, Queens County under Indictment 1718/09, of four counts of second-degree criminal possession of a weapon [P.L. §§ 265.03(1)(b) & (3)], four counts of third-degree criminal possession of a weapon [P.L. §§ 265.02(1) & (3)], seventh-degree criminal possession of a controlled substance [P.L. §220.03)], and operating a motor vehicle with a windshield obstructed [VTL §375(30)].

The court sentenced petitioner to concurrent indeterminate terms of sixteen years to life imprisonment on the second-degree weapons possession convictions, concurrent indeterminate terms of two to four years on the third-degree weapons possession convictions, a definite term of one year on the seventh-degree possession of a controlled substance conviction, and time served on the Vehicle and Traffic Law conviction.

In his brief to the Appellate Division, Second Department, petitioner raised the same claim that he now presents in this habeas petition; namely, that his Sixth Amendment right to effective assistance of counsel was compromised by his lawyer's failure to advance a meritorious argument on his suppression motion that had a reasonable probability of resulting in the suppression of all the physical evidence seized by the police and admitted against him at trial.

On April 27, 2016, the Appellate Division, Second Department of the New York Supreme Court affirmed the judgment below. People v. Porter, 138 A.D.3d 1148 (2d Dept. 2016). Upon timely application, permission to appeal to the New York Court of Appeals on this issue was denied on October 12, 2016. People v. Porter, 28 N.Y.3d 1030 (2016) (Rivera, J.).

Petitioner is now in the custody of respondent William Keyser, Superintendent of Sullivan Correctional Facility.

<u>STATEMENT OF FACTS</u>

<u>Introduction</u>

Petitioner was driving a car, that had four passengers, in Queens County late one night when the police pulled him over for various traffic infractions.  On approaching, one of the officers asked petitioner for his license, registration, and insurance documents, and received them.  As he was checking the documents, his fellow officer noticed an unmarked pill bottle containing a number of pills.  Although he thought the pills may well have been aspirin, he ordered everyone out and to the back of petitioner's car, and seized the bottle anyway.

Because a shooting had occurred in the immediate vicinity within the previous hour, the police radioed for a description of those involved.  They received a description that implicated petitioner's passengers, but not petitioner.  Nevertheless, the police continued to detain petitioner because of the pill bottle.  They radioed for assistance and a sergeant arrived, among others.  He interrogated one of the passengers, who told him that the occupants of the

car had been involved in the shooting, but also stated that she did not know whether there were guns in the car.

The police asked for, and received, petitioner's putative consent to search the trunk of his car. They did so at the scene and found nothing. But because the police believed that they could arrest petitioner for his possession of the pill bottle, they took him back to the precinct. There, they performed an inventory search of his car that did not conform to Police Department guidelines. That search produced a handgun. They stopped their search and obtained a warrant. On resuming their search, they found two more handguns.

The People charged petitioner with multiple counts of weapons possession, possession of a controlled substance, and driving with an obstructed windshield.

Prior to trial, petitioner, and three co-defendant passengers, moved for the suppression of the physical evidence that the police seized from his car trunk. Both police witnesses acknowledged that petitioner did not meet the description of anyone involved in the shooting, and testified at the hearing that they held petitioner only on account of the pill bottle and not the shooting.

The collective theory of defense counsels was that the police employed a pretext to stop the car, a theory counsel fully adopted -- but one that offered no chance of success under either the federal or the state constitutions.   In addition, counsel for petitioner argued, without any support from the record, that the police testimony was unworthy of belief.   Apart from those theories, counsel offered no argument in support of petitioner's suppression motion. Instead, he labored under the misunderstanding that if the initial police stop of petitioner was lawful, everything that happened subsequently was lawful as well.

The court denied petitioner's suppression motion.   Petitioner proceeded to a nonjury trial, after which he was convicted of all charges.

On direct appeal, the Appellate Division, Second Department rejected, on the merits, petitioner's argument that he was denied the effective assistance of counsel due to counsel's failure to make a meritorious argument on petitioner's suppression motion.   People v. Porter, 138 A.D.3d 1148 (2d Dept. 2016).   Petitioner specifically reiterated this argument in his application for permission to appeal to the New York Court of Appeals, which was denied. People v. Porter, 28 N.Y.3d 1030 (2016) (Rivera, J.).

- 5 -

The Mapp Hearing[1]

At approximately 3:40 a.m. on July 7, 2009, Police Officer Oleg Matat and his partner, Police Officer Triantiflidis, were patrolling in plainclothes and in an unmarked van in the vicinity of Broadway and 36th Street in Queens County (Matat: H1. 9-10, 56). While driving east on Broadway, at a speed between 20 to 25 miles per hour, they passed a Toyota Corolla driving in the opposite direction. Matat could not recall whether the street lamps were lit as the cars crossed paths (Matat: H1. 37-39). The car appeared "low to the ground," and Matat assumed it was "packed with people" or "had something heavy in the trunk" (Matat: H1. 10-11, 37-38, 39, 99), but later acknowledged that he could not judge the number of people in the car (Matat: H1. 57-58, 83).

Matat claimed that, as the cars passed, he saw an object hanging from the rearview mirror, obstructing the Corolla's front windshield (Matat: H1. 11, 39, 63-64, 84, 100). Matat later determined the object was a one-and-a-

---

[1]     Because of duplicative numbering of the transcripts, numbers in parentheses preceded by "H.1" refer to the minutes of the hearing, dated February 4, May 10, July 13, and June 29, 2010; those preceded by "H.2" refer to hearing minutes, dated July 29, 2010; those without prefix refer to the minutes of the bench trial, dated July 21-28, 2011; and, those preceded by "S." refer to the minutes of petitioner's sentencing, dated September 22, 2011. Names in parentheses refer to the witness.

half-foot stethoscope, eight inches of which descended from
the car's rearview mirror (Matat: H1. 84).   Matat and Tri-
antiflidis turned and followed the Corolla for several
blocks to 31st Street and Broadway, where the driver, peti-
tioner Melvin Porter, turned onto Astoria Boulevard, alleg-
edly without signaling (Matat: H1. 12-13, 67, 85).   The po-
lice continued to follow the car, claiming that they were
driving 40 to 50 miles per hour in a 30 mile per hour area.
After three to five blocks, they ordered the driver to stop
(Matat: H1. 13, 102).   In addition to petitioner, there
were four other individuals in the car: Jerome Abraham,
who, Matat believed, might have been wearing a gray shirt,
in the front passenger seat; and Michael Soto, Dennis
Crandle and Jennifer Cabezas seated in the back (Matat: H1.
14-16, 19, 47).

Petitioner, who had immediately stopped the car in re-
sponse to the police directive, was cooperative and provid-
ed Matat's partner with his license, insurance and regis-
tration (Matat: H1. 41, 90, 104).   Matat acknowledged that
the police "didn't give it [the documents] back to [peti-
tioner]" (H1. 107).

Meanwhile, Matat, looking through the front passenger
window, saw a pill bottle inside a cup holder on the center

- 7 -

console of the car (Matat: H1. 17, 41-44, 69, 71, 91). He
could not recall whether the bottle was upright or on its
side (Matat: H1. 71, 92). The cup holder was approximately
3 to 4 inches deep, and the pill bottle was approximately 2
inches in length and an inch in diameter (Matat: H1. 72,
91, 110). The bottle itself was orange with a white cap
and had "no writing" or "prescription" (Matat: H1. 17, 41-
44, 69, 71, 91). On direct, Matat asserted it contained
nine pills, but on cross admitted that he could not judge
the number of pills and just assumed that because the bot-
tle appeared half an inch full (Matat: H1. 44, 72-73).
Matat conceded that the "small white pills" inside the bot-
tle could have been aspirin, but, nevertheless, maintained
that he had reason to "believe that it was controlled sub-
stances" (Matat: H1. 44, 92-94).

None of the car's occupants made any threatening ges-
tures or remarks (Matat: H1. 45, 105). However, because
Matat had observed the pill bottle in the center console,
he and his partner ordered everyone out of the car and to
the back of it (Matat: H1. 17, 46, 95, 107-108). The po-
lice frisked each individual, finding no weapons (Matat:
H1. 17, 46, 95, 107). Matat asserted that the police did
not arrest the car's occupants at that point (Matat: H1.

114).   But he acknowledged that they were not "free to leave" (Matat: H1. 114-15).

After ordering everyone out, Matat seized the bottle from the car and then called for additional units to assist them (Matat: H1. 17, 45, 113).   Matat did not know exactly what was in the bottle because he did not open it and look inside until later at the police precinct (Matat: H1. 116).

With petitioner and the others detained outside of the car, Matat radioed for a description of the suspects from a shooting reported at approximately 2:30 a.m. (Matat: H1. 18, 34-36, 57-58).   Matat and his partner had been canvass-ing for those involved, who, they believed, were on foot (Matat: H1. 34-36, 57-58).   Matat confirmed at the hearing that "the only reason" he stopped the car was "because of the traffic infraction" (Matat: H1. 88-89) because none of the earlier transmissions regarding the shooting mentioned a car (Matat: H1. 35-36, 57-58).   The dispatcher told Matat that the shooting suspects appeared to be two black men, one dressed in a gray shirt and the other in dark clothing, one Hispanic man with "two ponytails" dressed in dark clothing and one Hispanic woman wearing checkered shorts (Matat: H1. 19, 60-61).   With the car's occupants now out-side, the police observed that, in addition to Abraham's

- 9 -

gray shirt, Soto wore his hair in two cornrow braids and that Cabezas was wearing checkered shorts (Matat: H1. 15).

Sergeant Michael Almonte, the supervising officer, ar-rived five minutes later and acknowledged that the occu-pants of the car were being detained because of what had been recovered in the orange bottle (Almonte: H1. 154, 196). Almonte claimed at the hearing that the group of five whom the police had detained "basically matched the description of" the four individuals involved in an "earli-er shooting," except for petitioner who was older and did not match the description of the suspects, who allegedly were in their twenties (Almonte: H1. 154-55, 184-185).

Taking Cabezas aside, Almonte asked her where they had come from, to which she responded that "they were involved in a shooting earlier" (Almonte: H1. 157, 196). "[S]he didn't want anything to do with the shooting" and did not "know why they shot" (Almonte: H1. 157, 196). Asked if there were weapons in the car, Cabezas responded that she "did not know" (Almonte: H1. 158). She also told Almonte that they had stopped near the Woodside Projects and the others were standing by the trunk of the car, but she reit-erated that "she didn't know whether there was [sic] guns in the car" (Almonte: H1. 158). After Almonte spoke with

- 10 -

Cabezas, the police handcuffed the entire group (Matat: H1. 74).

Matat conceded that petitioner did not match the description of anyone involved in the shooting (Matat: H1. 116). Thus, he clarified that petitioner was not arrested because of the shooting:

> [DEFENSE COUNSEL]: So [petitioner] was under arrest for the shooting or the pills? I'm not too clear about that.
>
> [MATAT]: The pills.

(Matat: H1. 116). Almonte agreed that petitioner was arrested for "prescription medication in the vehicle" because "someone happened to inform me" that the pills were not "prescribed to any of our defendants" (Almonte: H1. 159, 190-91, 199-200).

After arresting petitioner, Matat claimed he obtained petitioner's consent to search the car and did so, but did not find anything incriminating (Matat: H1. 55, 75, 96, 116-122). Almonte, who was Matat's superior officer, had no recollection of this search, testifying that Matat never notified him that petitioner had consented to the police opening the trunk (Almonte: H1. 181, 198, 203).

The police drove the Corolla to the 114th Precinct where Almonte and Matat performed an "inventory" search

- 11 -

(Matat: H1. 53; Almonte: H1. 167).   Matat admitted that he
did not abide by the specific procedure governing inventory
searches that required him to record the items removed on a
specific form and voucher the property for "safekeeping"
(Matat: H1. 24-33, 77).   Instead, he itemized the property
in his memo book and returned it to the owner, petitioner's
fiancée, later that day (Matat: H1. 24-33, 32-33, 77).   Al-
monte, who supervised the inventory search, was unaware of
any police guidelines governing the search procedure and
did not know if any officer used the required forms to con-
duct the inventory search (Almonte: H1. 168, 200).

When Matat found a black revolver in a glove box in
the car's trunk, he halted the search until Almonte ob-
tained a warrant (Matat: H1. 28, 53-54, 97, 122; Almonte:
H1. 162, 180).   Almonte initially testified that he applied
for the search warrant not knowing that Matat had discov-
ered a gun during the inventory search, but later stated he
knew about the gun when applying for the warrant because he
seen it himself (Almonte: H1. 171-75).   With a warrant, the
Evidence Collection Team found three guns, a black .38 cal-
iber Rossi revolver, a .25 caliber Raven Arms, and another
.38 caliber revolver, which were vouchered, photographed,
dusted for prints, and swabbed for DNA (Police Officer Mar-

cia Rios: H1. 133-39, 142-43, 147; Matat: H1. 29-30; Almon-
te: H1. 178, 180).

The Defense Argument

In moving for suppression of the physical evidence
stemming from the stop, petitioner's counsel joined the ar-
guments made by the co-defendants' attorneys (H2. 2, 17).[2]
Collectively, defense counsels submitted that the police
stopped petitioner's car for pretextual reasons.  Counsels
argued that the People's witnesses' testimony, and Matat's
testimony in particular, was "tailored to try to overcome
issues concerning stoppage" and search of the car, citing,
inter alia, the contention that they saw a stethoscope ob-
structing the windshield, that petitioner made an illegal
turn, had reasonable suspicion to believe that the pill
bottle contained illegal prescription drugs, and conducted
a proper inventory search at the precinct (H2. 3, 6, 8-9,
17-19).  Alternatively, counsel for petitioner submitted
that the that police predicate for the car stop -- includ-
ing their observation of the stethoscope; the car's speed-

---

[2]     At the start of oral arguments, Abraham's counsel explained
to the court that "Mr. Kelton [Crandle's counsel] is going to
make the argument for most of us" and, prior to making his own
argument, petitioner's counsel stated that he "adopt[ed] what
[Abraham's counsel] said" and also stated "[c]learly, my argument
is going to be along what Mr. Laykind [Soto's counsel] had to say
as well" (H2. 2, 17).

- 13 -

ing; and, making an illegal turn -- was "so beyond credibility" that the court should "not … credit it" (H2. 17).

While defense counsels argued that "there [was] no indicia that what's in that bottle [was] criminal at all," (H2. 8-9), they never advanced the specific legal argument that the police lacked the requisite probable cause to search the car and retrieve the bottle.  Thus, they never argued that to the extent the arrest of the car's occupants was predicated upon their possession of the bottle, it was unlawful.  Nor did petitioner's counsel argue that because petitioner did not match the description of any of those involved in the shooting and Cabezas did not know whether there were any weapons in the car, the police had no probable cause to arrest him for either the shooting or the weapons possession.  Counsel failed to argue that the police did not claim to have detained petitioner because they suspected him in the shooting.

Counsel also never argued that because the police had no lawful grounds to arrest petitioner, his "consent" to the search of his car trunk was coerced.  Co-defendants' counsels left the issue of consent for petitioner's counsel:

> THE COURT:  Let me ask Mr. Laykind regardless of whether there was a proper

- 14 -

> inventory search, there was testimony
> from Officer Matat that [petitioner]
> had given consent to the search of the
> car.
>
> Once there was a valid consent to
> search, what's the relevance of the in-
> ventory?
>
> [SOTO'S COUNSEL]:  Well I am sure coun-
> sel is going to argue that there was no
> consent.

(H2. 13).  But to petitioner's counsel, "[t]he credibility

of the police in this case is clearly the issue here" (H2.

17).  Moreover, to his mind, it was the sole issue.  In

counsel's words:

> I think clearly if your Honor credits
> the testimony of the police in this
> case, they obviously have probable
> cause to stop the vehicle, and obvious-
> ly once they have probable cause, the
> officer saw what he saw in the vehicle
> and everything follows, you know rou-
> tinely after that.

(H2. 17).  Pursuant to this view of the case, counsel con-

fined his argument as to the police seizure of the pill

bottle to a claim that the factual predicate, as rendered

by Matat's testimony, was "almost physically impossible"

(H2. 18-19).

The Prosecutor's Argument

The prosecutor argued that the police observed several

traffic infractions and had a legal basis to stop the car

- 15 -

(H2. 21).    According  to  the  prosecutor,  Matat  approached
the  car  and  "observed  the  pill  bottle"  and  "asked  what  it
was"  but  "[n]obody  fessed  up  as  to  who  the  pill  bottle  be-
longed  to"  (H2. 21).    The  prosecutor  noted  that  "based  upon
his  training  and  appearance,  [Matat]  observed  that  it  was
unmarked"  and  that  "[t]here  was  no  indicia  of  a  prescrip-
tion  with  respect  to  the  pill  bottle"  (H.2 21-22).

At  that  point,  as  per  the  prosecutor,  Matat  "investi-
gated  what  he  believed  was  the  presence  based  upon  his
training  and  experience  and  in  identification  and  packaging
of  narcotics  that  this  may  be  narcotics,"  and  ordered  the
occupants  out  of  the  car  (H2. 22).    The  prosecutor  contin-
ued:

> Based  upon  that,  and  this  was  complete-
> ly  devoid  in  any  argument  made  by  coun-
> sel,  they  began  to  think  oh,  hey,  wait,
> wait  a  minute.    Wasn't  there  a  shooting
> an  hour  before.    And,  oh,  yes,  there
> was  a  shooting  approximately  several
> blocks  away  from  here.    Oh,  and  wait  a
> [minute].    Half  the  description  [sic].
> There  were  two  male  blacks,  one  male
> Hispanic,  and  furthermore,  a  female
> Hispanic  with  checkered  shorts  which
> was  identical  to  the  radio  run  that
> they  had  received  an  hour  before.
> Based  upon  those  observations,  and  fur-
> thermore,  based  upon  the  separation  of
> the  female  witness  which  again  was  not
> even  mentioned  by  any  counsel,  Jennifer
> Kebasis  (phonetic)  who  made  statements
> to  Sergeant  Almonte,  hey  we  were  just
> involved  in  a  shooting,  to  that  effect,

- 16 -

> that's when the officers brought the
> four individuals back.

(H2. 22).

The prosecutor justified the ensuing police search of petitioner's car trunk on three grounds.  First, in the words of the prosecutor: "Mr. Porter had consented to the search of this vehicle.  That has been uncontroverted.  I submit to you that the police had the right to search based upon the consent" (H2. 23).  Second, the police conducted an "inventory search" of the car, although the prosecutor allowed that "[i]t may not be the perfect definition of an inventory search as required under the law" (H2. 23).  Third, the prosecutor argued that after the police "looked into the car and said, hey, you know what, there is a gun here[,]" they obtained a search warrant" (H2. 23).  In the eyes of the prosecutor, the warrant justified the police "recovery of the two additional weapons" (H2. 23-24).

The Hearing Court's Decision and Order

In its findings of fact, the court credited Matat's testimony that he decided to follow petitioner's car because a stethoscope obstructed its rearview mirror and that he pulled the car over because it exceeded the speed limit and had made a turn without signaling (H2. 27-28)

- 17 -

The court determined that as Matat approached the car "he observed an orange medicine bottle with a white cap which he observed to contain pills in the car's center console" (H2. 28). The court found that Matat then "recovered that pill bottle and discovered that it was unmarked with any type of prescription" (H2. 28).

Based upon that observation, the court found that Matat ordered the occupants out of the car "so that he could further investigate the situation" (H2. 28). On doing so, according to the court's findings, Matat "observed that the occupants of the car fit the description that he had received in a radio run approximately one hour before, a participant in a shooting in the area of 20 Street and 29 Street approximately one mile away from the location where he had stopped the car" (H2. 28-29).

But the court never found that petitioner fit the description of any of those involved in the shooting. Indeed, the court specifically found that the shooting suspects were "all in their twenties" and that petitioner was "an older male" (H2. 29).

The court noted that after the occupants got out of the car, Matat "frisked the defendants for his safety" and called for backup (H2. 29). In the court's view, Matat

"also asked defendant Porter at that point for permission to search the car including the trunk and was given permission by defendant Porter to do so" (H2. 29 (emphasis added).

When backup arrived, according to the court's findings, Sergeant Almonte spoke with Cabezas, who related "that she and the occupants of the car had earlier been involved in a shooting and that they were then driving her home" (H2. 29). The court found that Cabezas told Almonte "that while she had seen the car's occupants at the trunk of the car, she did not know if the guns that were used in the shooting had been placed in the trunk of the car (H2. 30). The court noted that Almonte "also observed that the occupants of the car again with the exception of the defendant Porter matched the description that he had received earlier of suspect[s] in a shooting in a nearby area" (H2. 30). According to the court, "[t]he defendants at that point were all placed under arrest and brought back to the 114 Precinct" (H2. 30).

The court found that, in the Precinct, Matat "voucher[ed] the Toyota and began conducting an inventory of its contents" (H2. 30). As he was doing so, "he observed a handgun in a box of latex gloves" (H2. 30). Per the

- 19 -

court's findings, Matat then "seized this inventory of be-
longings and at the direction of Sergeant Almonte applied
for and obtained a search warrant for the car in the execu-
tion of which three handguns were recovered" (h2. 30).

As to its conclusions of law, the court determined
that the police had a "reasonable basis" to stop the car
"based on defendant Porter's failure to signal turning"
(H2. 28, 32).

The court ruled:

> When [Matat] observed an unmarked pill
> bottle in the car and that the occu-
> pants of the vehicle with the exception
> of defendant Porter closely resembled
> four individuals alleged to have been
> involved in the shooting earlier [that]
> morning, less than a mile away from the
> location where the car was stopped,
> that he had a reasonable basis upon
> which to order the occupants out of the
> car, frisk them for his safety and de-
> tain them briefly pending [his] inves-
> tigation.

(H2. 32).

As to the legality of the arrest, the court held that
once Cabezas "indicated to Sergeant Almonte that the occu-
pants of the car had been involved in a shooting," "the po-
lice suspicion ripened into probable cause to arrest the
car's occupants" (H2. 32). The court also ruled that Por-
ter consented to the search after the police had ordered

- 20 -

everyone to exit the car and frisked each individual (H2. 31), and that his consent excused Matat's and Almonte's "actions … back at the precinct" which "may not have constituted an appropriate inventory search pursuant to police guidelines" (H2. 32).  The court also determined that "in an excess of caution" the police obtained a search warrant before completing their search of the car (H2. 32-33).

Accordingly, the court denied petitioner's motion to suppress the tangible evidence seized from the car that he was driving (H2. 34).

<u>The Trial</u>

The seized weapons and narcotics were the primary evidence against petitioner.  Without them, there would not have been sufficient evidence to convict petitioner of the possessory crimes.

<u>Verdict and Sentencing</u>

The court convicted petitioner of four counts of second-degree criminal possession of a weapon, four counts of third-degree criminal possession of a weapon, seventh-degree criminal possession of a controlled substance, and

operating a motor vehicle with a windshield obstructed (619-621).[3,4]

The court sentenced petitioner, as a persistent violent felony offender, to concurrent indeterminate terms of sixteen years to life imprisonment on the second-degree weapons possession convictions, concurrent indeterminate terms of two to four years on the third-degree weapons possession convictions, a definite term of one year on the seventh-degree possession of a controlled substance conviction, and time served on the Vehicle and Traffic Law conviction (S. 3-4, 6-7).

Summary of Petitioner's Argument to the Appellate Division

Petitioner noted that, at the Mapp hearing, the prosecution justified the police search of the car's trunk on three grounds: (1) petitioner consented to it; (2) it was a proper inventory search; and, (3) it was completed after the police obtained a search warrant.

Petitioner argued that the adequacy of these grounds depended upon the legality of the police seizure of the

---

[3]    The court also convicted Abraham on all counts (618).
[4]    The court drew an adverse inference against the People because they were unable to produce the police records, and any other Rosario materials relating to the decision voiding Cabezas's arrest which both petitioner's counsel and Abraham's counsel argued was relevant to judging the credibility of her testimony and pretrial statements (556-62).

- 22 -

pill bottle, which the People offered, along with petition-
er's proximity to the passengers in his car who met the de-
scription of those involved in the shooting, to justify
their detention of petitioner at the scene of the car stop.
But, petitioner maintained, neither of those things provid-
ed the police a lawful predicate to detain petitioner.

First, the police lacked probable cause to enter the
car and seize the bottle since the officer who did so tes-
tified frankly that he did not know whether it contained
aspirin or unprescribed narcotics.  Second, the police wit-
nesses stated that they arrested petitioner for possession
of the pill bottle and not because they suspected him of
being involved in the shooting.  Third, petitioner's mere
proximity to others suspected of involvement in a crime
could not have provided probable cause for his arrest for
that crime -- even had that been a reason invoked by the
police.

Without a lawful predicate to detain petitioner, the
search of the car trunk and the seizure of the guns in it
could not have been justified on any of the grounds offered
by the People.

Counsel's principal argument in support of petition-
er's suppression motion was that the police stop of peti-

- 23 -

tioner's car for traffic violations was pretextual and that the police testimony was "tailored to try to overcome issues concerning stoppage" and search of the car.  But, contrary to counsel's understanding, a traffic violation justifies a car stop even if the police were acting upon another motive.  Therefore, this ground counsel advanced for suppression was inadequate.

Alternatively, counsel made the tautological argument that the police testimony justifying the stop of petitioner's car was "so beyond credibility" that the court should "not … credit it" (H2. 17).  But counsel gave the hearing court no reason in the record to disbelieve that the police witness could have seen a stethoscope obstructing a car's windshield; an illegal turn; and, a car exceeding the speed limit.  Without advancing such a reason, counsel's police incredibility argument, though facially viable, was simply feeble and it, too, could not support petitioner's suppression motion.

In short, petitioner submitted that counsel abjured a meritorious suppression argument in favor of one that was not legally cognizable, and another that was just a bald-faced repudiation of the police testimony.  Petitioner concluded that counsel's inexcusable failure to articulate the

proper legal basis of his motion constituted ineffective assistance under the federal standard for assessing counsel's performance.  See Strickland v. Washington, 466 U.S. 668 (1984).  Where the most powerful inculpatory evidence against petitioner at trial was the contraband guns seized as a result of the illegal search, counsel's failure operated to petitioner's prejudice.

Summary of the People's Argument to the Appellate Division

The People advanced the following argument to justify the police seizure of petitioner:

> After defendant's car was stopped, Officer Matat observed an unlabeled pill bottle, which none of the occupants claimed.  Then, Officer Matat noticed that four of the five occupants of the car matched the description of shooters that had been broadcasting over the radio for the past hour.  Because of these observations, Officer Matat had reasonable suspicion to order them out of the car and detain them.

People's Brief at pages 40-41.

The People argued that "defense counsel provided meaningful representation."  People's brief at p. 23.  To support this argument, they pointed out that:

> Defense counsel filed various pre-trial motions, obtained a favorable *Sandoval* ruling, effectively cross-examined witnesses, raised numerous objections, and delivered opening and closing statements that emphasized his theory of de-

- 25 -

> fense.    Thus, when defense counsel's
> representation is viewed as a whole, it
> is clear that his representation was
> that of, at the very least, a reasona-
> bly competent attorney.

People's brief at p. 23.   Thus, the People justified coun-

sel's representation by balancing all that he did right

against the one thing that he did wrong.

<u>The Appellate Division Decision</u>

The Appellate Division affirmed, reasoning:

> Contrary to the defendant's contention,
> he was not deprived of the effective
> assistance of counsel at the suppres-
> sion hearing (*see People v. Benevento*,
> 91 N.Y.2d 708, 674 N.Y.S.2d 629, 697
> N.E.2d 584; *People v. Baldi*, 54 N.Y.2d
> 137, 444 N.Y.S.2d 893, 429 N.E.2d 4000;
> *see also People v. Caban*, 5 N.Y.3d 143,
> 155-156, 800 N.Y.S.2d 70, 833 N.E.2d
> 213).   Defense counsel's conduct at the
> hearing was reasonably competent under
> the circumstance (*see People v. Bene-
> vento*, 91 N.Y.2d at 712-713, 674
> N.Y.S.2d 629, 697 N.E.2d 584) and while
> the defendant contends that defense
> counsel failed to make certain argu-
> ments in support of suppression, those
> arguments cannot be fairly character-
> ized as clear-cut and dispositive in
> the defendant's favor (*see People v.
> McGee*, 20 N.Y.3d 513, 518, 964 N.Y.S.2d
> 73, 986 N.E.2d 907; *cf. People v. Cler-
> mont*, 22 N.Y.3d 931, 977 N.Y.S.2d 704,
> 999 N.E.2d 1149) so as to render de-
> fense counsel ineffective for failing
> to make them.

<u>People</u> v. <u>Porter</u>, 138 A.D.3d 1148 (2016).

- 26 -

Petitioner made a timely application for leave to appeal to the New York State Court of Appeals.  On October 12, 2016, that court denied his application.  <u>People</u> v. <u>Porter</u>, 23 N.Y.3d 1030 (2016).

<u>ARGUMENT</u>

COUNSEL'S FAILURE TO ADVANCE A MERITORIOUS SUPPRESSION ARGUMENT DEPRIVED PETITIONER OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.  U.S. CONST., AMENDS. VI, XIV.

In this gun possession case, counsel moved for the suppression of physical evidence that the police seized during a late night encounter with petitioner, who was driving a car with three others in it. The police stopped the car for a traffic infraction and one of the officers, Matat, saw a pill bottle in the car's console.  At the suppression hearing, Matat testified that he did not know what was in the bottle, and acknowledged that might have contained aspirin.  Nevertheless, he ordered petitioner, and everyone else, out of the car and arrested them.  In subsequent searches of the car, the police found the weapons that formed the basis of the State's case against petitioner.

Defense counsel's broad ignorance of search and seizure law is at the heart of this petition.  Counsel har-

- 27 -

bored the misconception that the police could not use a traffic infraction as a pretext for a stop of a vehicle, and challenged an officer's credibility based upon testimony that, even if far-fetched, was plausible.

He failed to argue that because the pill vial's contraband nature was not immediately apparent to the police, their seizure of it did not meet the plain view exception to the Fourth Amendment warrant requirement. Where the police acknowledged that they arrested petitioner because of the pill vial, counsel should have argued that petitioner's arrest unlawful.

Further, counsel did not know that: a person who is unlawfully in police custody cannot be deemed to give consent to a police request to a search; third-party statements obtained as a result of illegal police conduct which inculpates a defendant is also suppressible; merely being in the presence of someone who is suspected of a crime does not supply the police with probable cause to arrest; an investigative detention is unlawful; and, an inventory search, or a warrant obtained after the fact, does not render a search lawful where the underlying arrest was not.

For these reasons it is evident that counsel's performance fell far below an objective standard of reasonable-

ness.   Moreover, there is a reasonable probability that counsel's inexcusable oversight led to a guilty verdict in petitioner's bench trial.   Simply put, had the suppression court granted petitioner's motion, the evidentiary basis of the State's case against him would have collapsed.   Accordingly, petitioner was denied the effective assistance of counsel.   U.S. Const. Amends. VI & XIV.

Standard of Review

The standard of review of this habeas corpus petition proceeding is governed by 28 U.S.C. §2254, as amended by the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1218.   A state prisoner, seeking relief in a federal court on a constitutional claim after April 26, 1996, may not succeed "unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d)(1).

Under the Supreme Court's "contrary to" test for constitutionality, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law." Williams v. Taylor, 529 U.S. 362, 412-413 (2000).

The "unreasonable application" test raises the question of whether the state courts' decisions were "objectively unreasonable" and not merely incorrect. See generally Williams v. Taylor, 529 U.S. 362, 409-410 (2000); White v. Woodall, ___ U.S. ___, 134 S.Ct. 1697, 1702, (2014); Jones v. Stinson, 229 F.3d 112, 119-120 (2d Cir. 2000). Yet, the trial court's decision need not teeter on "judicial incompetence" to warrant relief under §2254(d). As viewed by the Second Circuit, that standard does not require that "all reasonable jurists would agree that the state court erred." Jones, 229 F.3d at 119 (internal quotation marks and citation omitted). Rather, it falls somewhere between "merely erroneous and unreasonable to all jurists" and that the increment beyond mere error "need not be great," "otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Jones, 229 F.3d at 119 (internal quotation marks and citations omitted).

## The Strickland v. Washington Test

Under Strickland, to establish a violation of the Sixth Amendment right to effective assistance of counsel, petitioner "must (1) demonstrate that his counsel's performance fell below an objective standard of reasonableness in

- 30 -

light of prevailing professional norms; and (2) affirmatively prove prejudice arising from counsel's allegedly deficient representation." Rosario v. Ercole, 601 F.3d 118, 129 (2d Cir. 2010) (internal quotation marks and citation omitted).

"To satisfy the first prong – the performance prong – the record must demonstrate that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment." Wilson v. Mazzuca, 570 F.3d 490, 502 (2d Cir. 2009) (quoting Strickland, 466 U.S. at 687); see also Kimmelman v. Morrison, 477 U.S. 365, 374 (1986) ("The right to counsel assures the fairness, and thus the legitimacy, of our adversarial process…. The essence of an ineffective-assistance counsel claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect.").

While "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," Strickland, 466 U.S. at 690, "omissions that cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from

- 31 -

oversight, carelessness, ineptitude, or laziness," does not meet the constitutionally minimum standard of effectiveness. Wilson, 570 F.3d at 502 (internal quotation and punctuation marks and citation omitted).   Thus, under Strickland's performance prong, a reviewing must determine "whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." Strickland, 466 U.S. at 690; Linstadt v. Keane, 239 F.3d 191, 198-199 (2d Cir. 2001). Where the error in question is an omission or failure to act, "ineffective assistance may be found where counsel omitted significant and obvious issues while pursuing issues that were clearly weaker." Brown v. United States, 167 F.3d 109, 110 (2d Cir. 1999) (internal quotation marks and citation omitted); see e.g., Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (ineffective assistance found where counsel presented substantial evidence that petitioner suffered from "explosive dyscontrol" at the time of murders, but failed to request a diminished-capacity instruction that would have permitted the jury to consider whether he could have premeditated the murders; instead counsel requested only an intoxication charge despite evidence that the drugs were wearing off well before the murders); Fagan

- 32 -

v. Washington, 942 F.2d 1155, 1157 (7ᵗʰ Cir. 1991) (appel-
late counsel's failure to raise two claims that would have
resulted in reversal and his decision to pursue other weak-
er claims could be attributed to "no tactical reason – no
reason other than oversight or incompetence"); Matire v,
Wainwright, 811 F.2d 1430, 1438 (11ᵗʰ Cir. 1987) (ineffec-
tive assistance found where appellate counsel failed to
raise a "substantial, meritorious Fifth Amendment issue"
and, instead raised a "weak issue" challenging trial
judge's failure to send written instructions to jury).

It follows that a trial lawyer's failure to pursue a
course of action should not be deemed a strategic decision
where it could have only helped the defendant, without un-
dermining or contradicting other defense contentions. See
Cox v. Donnelly, 387 F.3d 193, 199 (2d Cir. 2004) ("implau-
sible" that counsel's failure to object to unconstitutional
instructions on intent was strategic, in the absence of any
reasonable explanation for his conduct); Flores v. Demskie,
215 F.3d 293, 304 (2d Cir. 2000) (defense counsel was inef-
fective in waiving a per se new-trial claim, where "[t]he
only basis for this waiver was counsel's misunderstanding
of [state case law] and the failure to realize that harm-
less error did not apply"); Henderson v. Sargent, 926 F.2d

- 33 -

706, 711-712 (7th Cir. 1991) (counsel was ineffective for pursuing weak alibi defense without presenting evidence that another person had committed the murder, a theory that "would have been entirely consistent with Henderson's alibi defense;" thus, counsel had everything to be gained and nothing to lose from presenting this evidence").

The second Strickland prong -- the prejudice prong -- is met where a petitioner "show[s] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694; see also Buck v. Davis, ___ U.S.___, ___, 137 S.Ct. 759, 776 (2017).  Even a single error will qualify as ineffective assistance if it is sufficiently prejudicial to meet the Strickland standard.  Murray v. Carrier, 477 U.S. 478, 496 (1986); Kimmelman, 477 U.S. at 383.  The reasonable probability standard does not require proof by a preponderance of the evidence, nor does it require that absent counsel's error, there would have been insufficient evidence to convict.  See Kyles v. Whitley, 514 U.S.

In the context of a suppression hearing, "[w]here defense counsel's failure to litigate a Fourth Amendment

- 34 -

claim competently is the principal allegation of ineffec-
tiveness, the defendant must also prove that his Fourth
Amendment claim is meritorious and that there is a reasona-
ble probability that the verdict would have been different
absent the excludable evidence in order to demonstrate ac-
tual prejudice." Kimmelman v. Morrison, 477 U.S. 365, 375
(1986).  Under Kimmelman's governing logic, whether peti-
tioner would have had a "meritorious" motion is judged by
whether there is a reasonable probability that the motion
would succeed.

   To satisfy the reasonable probability test, "a defend-
ant *need not show* that counsel's deficient conduct *more
likely than not* altered the outcome of the case." Henry,
409 F.3d at 63 (emphasis in original) (citing Strickland,
466 U.S. at 693).  "The level of prejudice that [a peti-
tioner] need demonstrate lies between prejudice that had
some conceivable effect and prejudice that more likely than
not altered the outcome in the case." Lindstadt v. Keane,
239 F.3d 191, 204 (2d Cir.2001) (internal quotation marks
omitted).  The Court has defined "reasonable probability"
as "a probability sufficient to undermine confidence in the
outcome" of the trial.  Strickland, 466 U.S. at 694.  Ac-
cordingly, "'the benchmark for judging any claim of inef-

- 35 -

fective assistance must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on to have produced a just result.'" Henry, 409 F.3d at 63 (citing Strickland, 466 U.S. at 686). "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.'" Henry, 409 F.3d at 64 (emphasis in original) (citing Strickland, 466 U.S. at 694).

### The suppression hearing

At a Mapp hearing, the prosecution has the burden of going forward, and to meet that burden the prosecutor must present credible evidence. People v. Berrios, 28 N.Y.2d 361, 367 (1971). New York courts have determined that it will reject testimony as not meeting that standard only where it is "incredible and unbelievable, that is, impossible of belief because it is manifestly untrue, physically impossible, contrary to experience, or self-contradictory." See e.g., People v. Garafolo, 44 A.D.2d 86, 88 (2d Dept. 1974). However, it is settled law, under both the United States and New York state constitutions, that a pretext is not a viable suppression theory. Wren v. United States, 517 U.S. 806

(1996) (where police have probable cause to detain someone for a traffic violation, actual motive of police in detaining that person is irrelevant); People v. Robinson, 97 N.Y.2d 341, 355 (2001) (adopting Wren as a matter of New York State constitutional law); People v. Pealer, 20 N.Y.3d 447, 457 n.2 (2013)("Probable cause to believe that the Vehicle and Traffic Law has been violated provides an objectively reasonable basis for the police to stop a vehicle and … there is no exception for infractions that are subjectively characterized as 'de minimis'"). Counsel's strategy, therefore, was doomed from the outset since there was nothing inherently incredible about the traffic violations that the police claimed to have observed and those types of violations justify a car stop. It follows that counsel offered the hearing court no cogent legal theory in support of his suppression motion. Such a theory, however, was readily at hand.

To begin with, Police Officer Matat stopped petitioner for a Vehicle and Traffic Law violation. Therefore, for legitimate safety reasons, he could order the driver and occupants out of the car. See Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977). But while an officer "may conduct certain unrelated checks during an otherwise lawful traffic

stop . . . he may not do so in a way that prolongs the stop, absent reasonable suspicion ordinarily demanded to justify detaining an individual." Rodriguez v. United States, 575 U.S. ___, ___, 135 S.Ct. 1609, 1615 (2015). Accordingly, Matat could have properly detained petitioner only for so long as it took to make "ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez, 575 U.S. at ___, 135 S.Ct. at 1615 (internal quotation marks and brackets omitted). Matat, however, exceeded the scope of this limited license.

Matat related that he ordered petitioner and the other occupants out of the car because he had observed a pill bottle in the center console (Matat: H1. 17, 46, 95, 107-108). The bottle itself was orange with a white cap and had "no writing" or "prescription" (Matat: H1. 17, 41-44, 69, 71, 91). On direct, Matat asserted it contained nine pills, but on cross admitted that he could not judge the number of pills and just assumed it was nine because the bottle appeared half an inch full (Matat: H1. 44, 72-73). Matat conceded that the "small white pills" inside the bot-

- 38 -

tle could have been aspirin, but, nevertheless, maintained that he had reason to "believe that it was controlled substances" (Matat: H1. 44, 92-94).  Nevertheless, Matat and his partner ordered petitioner and everyone else out of the car, frisked them, but found no weapons (Matat: H1. 17, 46, 95, 107).  Matat then seized the pill bottle and called additional units to assist (Matat: H1. 17, 45-46, 95, 107-108, 113).

However, in order to enter the car and seize the bottle, under the plain view exception to the warrant requirement, Matat needed probable cause to believe that it contained contraband.

The Supreme Court has delineated the plain view exception as follows:

> [I]f police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object — *i.e.*, if its incriminating character is not immediately apparent, the plain-view doctrine cannot justify its seizure.

_Minnesota_ v. _Dickerson_, 508 U.S. 366, 375 (1993) (emphasis added) (citations, internal quotation and grammatical marks omitted).

Here, although the police might have lawfully viewed the pill bottle, the object's incriminating nature was not immediately apparent – as per Matat's own testimony. Thus, Matat's seizure of it failed to meet the fundamental requirement for the plain view exception -- that there was probable cause to believe that it contained contraband. See _Arizona_ v. _Hicks_, 480 U.S. 321, 326-327 (1987) (rejecting Arizona's argument that "reasonable suspicion" sufficed to invoke the plain view exception).

Notably, the prosecutor below never argued that the police had probable cause to seize the pill bottle. The prosecutor merely stated that Matat "investigated what he believed was the presence based upon his training and experience and in identification and packaging of narcotics that this may be narcotics" (H2. 22). Beyond that, the People implicitly conceded that the police lacked probable cause to seize the pill bottle when they argued that "only reasonable suspicion was necessary for the police to detain [Abraham] and the other occupants of the car for further investigation, and that was provided not only by the pill

- 40 -

bottle, but also by the fact that the occupants of the car matched the description of the possible perpetrators of a shooting in the area." People v. Abraham, A.D. No. 11-08162, Brief for Respondent, dated May 14, 2013, at p. 25.[5] Having failed to argue that the police had probable cause to seize the pill bottle -- indeed, having tacitly conceded that they did not have it -- the People have waived that argument under New York State procedural rules. See e.g., People v. Edwards, 95 N.Y.2d 486, 493 (2000); People v. Turriago, 90 N.Y.2d 77, 83-84 (1997); People v. Parris, 83 N.Y.2d 342, 350-351 (1994).

The question becomes whether the police detention of petitioner subsequent to the seizure of the pill bottle was lawful. Although Matat claimed at the hearing that peti-tioner was not under arrest when he got out of the car, he acknowledged that petitioner was not "free to leave" (Matat: H1. 114-15).

Indeed, at trial, Matat testified that everyone in the car was arrested the moment that the police ordered them out:

> [THE PROSECUTOR]:   And when you said
> you had asked the occupants of the car,

---

5   This brief, filed by the People in the case of Jerome Abraham, one of petitioner's co-defendants below, may be obtained from the Appellate Division, Second Department, or the Queens County District Attorney's Office.

> was there a reason why you had asked
> the occupants of the car to step out?
>
> [MATAT]:  Yes.
>
> [THE PROSECUTOR]:  What was the reason?
>
> [MATAT]:  Well, we didn't know who's
> [sic] bottle it was so the occupants of
> the car was gonna be under arrest.

(123-124).

In restraining petitioner in this manner, the police arrested him, since a reasonable person in petitioner's position -- having had the police order him out of his car because of a pill bottle, frisk him and direct him to stand in the back of his car -- would believe that he was under arrest.  See Brendlin v. California, 551 U.S. 249, 255 (2007).

Furthermore, even if the initial police restraint of petitioner did not amount to an arrest, it qualified as a seizure.  The police demanded and received petitioner's license and registration, but did not give those documents back to petitioner; ordered petitioner out of his car; subjected him to a frisk and made to move to the back of the car.  These actions qualified as a seizure within the rule of Terry v. Ohio, 392 U.S. 1, 16 (1968).  Certainly, petitioner could not have ended the encounter with the police even had he chosen to do so.  See Florida v. Bostick, 501

- 42 -

U.S. 429, 436-37 (1991)("[T]he appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter…. [T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business").

Consequently, whether arrested or seized, the police detention of petitioner was predicated upon Matat's seizure of the pill bottle. As demonstrated above, however, that act was lawless. It follows that the police seizure of petitioner cannot have been lawful where it rests upon an invalid predicate. See Florida v. Royer, 460 U.S. 491, 498 (1983) (a person "may not be detained even momentarily without reasonable, objective grounds for doing so").

Neither can the police detention of petitioner be justified upon the independent grounds that the police either suspected him in the shooting or to have been in possession of contraband weapons.

According to Sergeant Almonte, the occupants of the car that the police had detained "basically matched the description of" the four individuals involved in an "earlier

- 43 -

shooting," except for petitioner who was older and did not match the description of the suspects who allegedly were in their twenties (Almonte: H1. 154-55, 185).   Police Officer Matat also conceded that petitioner did not match the description of anyone involved in the shooting (Matat: H1. 116).

Indeed, both police witnesses readily admitted that they did not arrest petitioner for involvement with the shooting or on suspicion that guns were in his possession. Rather, they arrested him for possession of the pill bottle.   As per Matat:

> [DEFENSE COUNSEL]:  So [petitioner] was under arrest for the shooting or the pills?  I'm not too clear about that.
>
> [MATAT]:  The pills.

(H1. 116).   Almonte agreed that petitioner was arrested for "prescription medication in the vehicle" because "someone happened to inform me" that the pills were not "prescribed to any of our defendants" (Almonte: H1. 159, 190-91, 200).

Moreover, after the police questioned Cabezas, who admitted to being present at the shooting, the police still had no reason to link petitioner to it, or to believe the guns where in the car.   When they asked Cabezas whether

- 44 -

there were guns in the car, she candidly answered that she did not know (Almonte: H1. 158).

Thus, as the police witnesses recognized, they had no lawful grounds to arrest petitioner for either the shooting or the weapons possession because, in the words of the Supreme Court, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause." Ybarra v. Illinois, 444 U.S. 85, 91 (1979).

In addition, even if the police detention of petitioner was a seizure and not an arrest that, too, was not lawful because they lacked a reasonable suspicion that petitioner was involved in the shooting or the weapons possession.

First, as noted above, petitioner did not match the description that the police possessed of those involved in the shooting. And, as the Court has recognized, guilt by association is insufficient to establish probable cause. Ybarra v. Illinois, 444 U.S. 85, 91, 100 S. Ct. 338 (1979); Sibron v. New York, 392 U.S. 40, 62, 88 S. Ct. 1889 (1968). Consequently, the police had no legal basis to hold petitioner prior to obtaining Cabezas statement.

- 45 -

Second, the police could not detain petitioner even
after Cabezas gave them a statement.  While "the 'body' or
identity of a defendant or respondent in a criminal or civ-
il proceeding is never itself suppressible as a fruit of an
unlawful arrest," Immigration and Naturalization Service v.
Lopez-Mendoza, 468 U.S. 1032 (1984), evidence obtained as a
result of an illegal seizure which identifies a defendant
as the perpetrator of a crime is suppressible.  See, e.g.,
Davis v. Mississippi 394 U.S. 721 (1969); see also United
States v. Garcia-Beltran, 389 F.3d 864 (9th Cir. 2004).

Here, when Cabezas made her statement, the police had
already detained petitioner beyond the time necessary to
resolve the traffic violation, which was the only valid
predicate for detaining petitioner in the first place.  Ro-
driguez, 575 U.S. at ___, 135 S.Ct. at 1615.  Therefore,
Cabezas statement to Almonte at the scene -- to the extent
that it sufficiently identified petitioner as a participant
in the shooting or the weapons possession -- was itself
suppressible as the fruit of the unlawful seizure of the
pill bottle and the subsequent unlawful detention of peti-
tioner.  And, it is black letter law that the state "cannot
support a conviction through leads from ... unlawfully ob-

tained evidence." <u>Walder</u> v. <u>United States</u>, 347 U.S. 62, 65 (1954).

Stripped of the reasons that the People offered at the hearing for petitioner's seizure -- namely, that petitioner was in possession of a contraband pill bottle or that he was implicated in the shooting or the weapon possession -- it is apparent that the police simply conducted an investigatory detention.  That, of course, is also unlawful.  <u>See</u> <u>Dunaway</u> v. <u>New York</u>, 442 U.S. 200, 216 (1979) ("detention for custodial interrogation - regardless of its label - intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest"); see also <u>Davis</u>, 394 U.S. at 726 ("nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'").

Because the police had no lawful basis to either arrest or seize petitioner, or to extend his detention beyond the time necessary to resolve the traffic infraction, the People did not meet their burden to show that his consent to search his car trunk was voluntary.  Respondent may not explain this away by claiming that petitioner's consent was

lawful because the police could have validly detained him solely for the alleged Vehicle and Traffic Law infraction. Standing alone, a traffic infraction cannot justify Matat's request of petitioner for permission to search his car for weapons. Rodriguez, 135 S.Ct. at 1609. Accordingly, where petitioner's consent to the search of his car was predicated either upon his unlawfully being placed into police custody, or -- if validly detained for the purpose of the traffic infraction alone -- at the very least, upon Matat's unlawful request for permission to search, the evidence seized as a consequence was tainted and should have been suppressed. Royer, 560 U.S. at 501; Wong Sun v. United States, 371 U.S. 471, 487-88 (1962).

As an alternative to their consent theory, the People argued that the search was a valid inventory search and that, in any case, the police obtained a search warrant. But the inventory exception to the exclusionary rule may be invoked only where there has been a lawful arrest. See Illinois v. Lafayette, 462 U.S. 640, 643, 648 (1983). As shown, that was not the case here. In any event, as the hearing court recognized (H2. 32), the People offered no testimony to show Police Department policy regarding inventory searches, nor whether that policy was adhered to in

petitioner's case.  Consequently, the People did not meet their burden of showing the validity of the inventory search.

Finally, that the police obtained a warrant also does not provide an alternative justification for the search. Significantly, there were two police searches at the Precinct.  The first was conducted before they obtained a warrant, and produced a gun.  And, the second, conducted after they obtained a warrant, produced two more guns.

The warrantless search was invalid because, as noted, the police had unlawfully arrested petitioner.  Accordingly, the search incident to a lawful arrest exception to the warrant requirement does not pertain.  See United States v. Robinson, 414 U.S. 218 (1973).  And, of course, because the illegal search produced the evidence upon which the warrant issued, the warrant itself was also invalid.  Wong Sun, 371 U.S. at 487-88.

Counsel's representation of petitioner failed to meet an objective standard of reasonableness and prejudiced petitioner

As demonstrated, counsel's argument on the motion was nothing but an exercise in futility.  He contested what he should have conceded -- the legality of the police stop; and, conceded what he should have contested -- the validity of the police seizure of the pill bottle on less than probable cause

- 49 -

and their ensuing detention of petitioner for possession of
the bottle.  In making that concession, counsel opined that
if the court determined that the initial stop of the car was
lawful, "the officer saw what he saw in the vehicle and eve-
rything follows, you know routinely after that" (H2. 17).

Counsel's statement betrayed his complete misunderstand-
ing of the applicable legal standards of search and seizure
law.  As shown, where the seizure of the pill bottle was law-
less, then petitioner's subsequent detention for possessing
it was also lawless.  Moreover, his detention could not be
independently justified on grounds that he was in a car with
others suspected of a crime because (1) the police did not
rely upon that fact; (2) assuming for the sake of argument
that they did, their knowledge of his identity as an alleged
participant was itself the fruit of his unlawfully protracted
detention for being in possession of the pill bottle; and,
(3) mere proximity to others suspected of a crime cannot sup-
ply probable cause.  Thus, nothing that followed the police
seizure of the pill bottle was lawful -- or "routine[]" in
counsel's words -- nor should it have been used to justify
the search of petitioner's car trunk and the seizure of the
guns in it.  Counsel's failure to make that perfectly obvious

argument subverted a meritorious suppression application into a losing one.

In addition, counsel is to be faulted for not correcting the court's defective marshalling of the facts and its application of errant standards of law.  Thus, although both police witnesses testified that they arrested petitioner solely for possessing the pill bottle (Matat: H1. 116; Almonte: H1. 159, 190-91, 200), nevertheless, the court determined that "the police suspicion ripened into probable cause to arrest [petitioner]" because of Cabezas statement to them that "the occupants of the car had been involved in a shooting" (H2. 32).

Beyond that, without objection of counsel, the court found that the police had a "reasonable basis" to order the occupants out of the car because of the pill bottle and because "with the exception of defendant Porter[,] [they] closely resembled four individuals alleged to have been involved in the shooting earlier [that] morning (H2. 32).  But, in point of fact, the police testimony was that they did not receive a description of anyone involved in the shooting until <u>after</u> they had ordered the occupants out of the car (Matat: H1. 18, 34-36, 57-58).  Therefore, as a matter of law, the court should have parsed out, instead of

added in, any consideration of the shooting as justifying
the police ordering petitioner out of the car.[6]  Further, as
discussed, to seize the pill bottle and detain petitioner
for its possession, the police needed "probable cause,"
which, of course, is much more than a "reasonable basis."

It is thus apparent that under the first prong of
<u>Strickland</u>, counsel's performance fell below an objective
standard of reasonableness.  As the Supreme Court has put
it, a lawyer's "ignorance of a point of law that is fundamen-
tal to his case combined combined with his failure to perform
basic research on that point is a quintessential example of
unreasonable performance under <i>Strickland</i>."  <u>Hinton</u> v. <u>Ala-
bama</u>, ___ U.S.___, ___, 134 S.Ct. 1081, 1089 (2014) (cita-
tions omitted; <u>see also</u>  <u>Williams</u> v. <u>Taylor</u>, 529 U.S. 362,
395, (counsels' performance deficient where they "failed to
conduct an investigation that would have uncovered extensive
records [that could be used for death penalty mitigation pur-
poses], not because of any strategic calculation but because
they incorrectly thought that state law barred access to such
records"); <u>Kimmelman</u>, 477 U.S. at 385 (counsel's performance

---

6    At trial, Matat testified that the police arrested everyone when
they asked the occupants of petitioner's car to get out (123-124).
Thus, Matat's trial testimony directly contradicted one of the underly-
ing factual findings of the hearing court in denying petitioner's sup-
pression motion.  Therefore, based upon this testimony, counsel should
have moved to reopen the hearing.  In failing to do so, he again ren-
dered ineffective assistance.

deficient where he failed to conduct pretrial discovery and
that failure "was not based on 'strategy,' but on counsel's
mistaken belie[f] that the State was obliged to take the ini-
tiative and turn over all of its inculpatory evidence to the
defense").

Nor, indeed, can counsel's failure be explained away
as a trial strategy.  To begin with, to qualify as a trial
strategy a lawyer's decision must have been "a reasonably
informed decision made by an attorney with an eye toward
benefitting his client."  Cox, 387 F.3d at 198 (citation
and internal quotation marks omitted).  In any event, "not
all strategic choices are sacrosanct.  Merely labelling
counsel's errors strategy does not shield his trial perfor-
mance from Sixth Amendment scrutiny."  Henry v. Scully, 918
F.Supp. 693 (S.D.N.Y. 1995) (citation, internal quotation
marks, and brackets omitted).  Here, counsel conferred no
articulable benefit upon petitioner by neglecting to pre-
sent a cogent theory of suppression.  Indeed, this is a
classic example of a lawyer who had "nothing to lose, yet
everything to gain" by presenting an alternative, and more
persuasive, theory of law.  See Harrison v. Cunningham, 512
Fed.Appx. 40, 42 (2d Cir. 2013).  As the Second Circuit has
determined, where such is the case, "no considerations of

- 53 -

sound strategy even conceivably justifie[s] [an attorney's] decision not to do so." Id., (citations and internal quotations omitted); see also Massillon v. Conway, 574 F.Supp.2d 381, 395 (S.D.N.Y. 2008) (rejecting counsel's failure to move for suppression of identifications as a trial strategy "where it stemmed from a misunderstanding of the legal principles surrounding the suppression of pre-trial identifications").

Moreover, the second prong of Strickland has been satisfied because, as shown above, there is a reasonable probability that but for counsel's deficient performance at the suppression hearing, petitioner's motion would have been granted.  And, because the People had no other admissible evidence of petitioner's possession of the weapons apart form what the police illegally seized from petitioner's car trunk, there is a reasonable probability that petitioner would have been acquitted at trial had suppression been granted -- as it should have been.

Application of AEDPA to petitioner's claim

Strickland constitutes the clearly established law that governs ineffective assistance claims under AEDPA. Cullen v. Pinholster, 563 U.S. 170, 181, 131 S.Ct. at 1388,

1398 (2015); <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 520-521 (2003); <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 390-391, 413.

A state court decision is contrary to <u>Strickland</u> when it applies a rule that contradicts <u>Strickland</u>'s reasonable probability standard, by, for example, using the "outcome determinative standard" that petitioner "fail[ed] to demon-strate the result at trial would have differed but for counsel's performance." <u>Moore</u> v. <u>Secretary</u>, 457 Fed. Appx. 170, 182-183 (3d Cir. 2012). Even when a state court's de-cision includes both a proper and an incorrect prejudice standard, it is contrary to <u>Strickland</u> because it is impos-sible to determine the extent to which the court's resort to the incorrect standard affected its ultimate finding that the petitioner suffered no prejudice. <u>Williams</u>, 529 U.S. at 414.

A state court decision involves an "unreasonable ap-plication" of Supreme Court precedent when the state court either "identifies the correct governing legal rule" from the Supreme Court's cases but "unreasonably applies it to the facts" of the case, or "unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend

- 55 -

that principle to a new context where it should apply."
Williams, 529 U.S. at 407.

Here, the Appellate Division turned back petitioner's ineffective assistance of counsel claim reasoning:

> Contrary to the defendant's contention, he was not deprived of the effective assistance of counsel at the suppression hearing (*see People v. Benevento*, 91 N.Y.2d 708, 674 N.Y.S.2d 629, 697 N.E.2d 584; *People v. Baldi*, 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 4000; *see also People v. Caban*, 5 N.Y.3d 143, 155-156, 800 N.Y.S.2d 70, 833 N.E.2d 213). Defense counsel's conduct at the hearing was reasonably competent under the circumstance (*see People v. Benevento*, 91 N.Y.2d at 712-713, 674 N.Y.S.2d 629, 697 N.E.2d 584) and while the defendant contends that defense counsel failed to make certain arguments in support of suppression, those arguments cannot be fairly characterized as clear-cut and dispositive in the defendant's favor (*see People v. McGee*, 20 N.Y.3d 513, 518, 964 N.Y.S.2d 73, 986 N.E.2d 907; *cf. People v. Clermont*, 22 N.Y.3d 931, 977 N.Y.S.2d 704, 999 N.E.2d 1149) so as to render defense counsel ineffective for failing to make them.

People v. Porter, 138 A.D.3d 1148 (2016).

As petitioner will show, the Appellate Division's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. 28 U.S.C. §2254(d)(1).

- 56 -

For purposes of determining whether a state court decision exhibits such a defect, the Court's "cases emphasize that review under §2254(d)(1) focuses on what a state court knew and did." Pinholster, 563 U.S. at 182; Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (explaining that a state court adjudication will survive § 2254(d) "so long as neither the reasoning nor the result of the state-court decision contradicts" the Court's cases).

AEDPA directs a federal court's inquiry, not simply to the reasonableness of the state court outcome, but to the reasonableness of subsidiary findings and determinations which produced that outcome -- i.e., whether the state court adjudication "involved an unreasonable application of… law" or "was based on an unreasonable determination of the facts.…" § 2254(d)(1) & (2) (emphases added). See, e.g., Panetti v. Quarterman, 551 U.S. 930, 953 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied.").

Where one or more such defects is present, and the federal court is convinced the prisoner has proved constitutional error under § 2254(a), habeas corpus relief is available. See Wilson v. Corcoran, 562 U.S. 1, 5-6 (2010)

- 57 -

(per curiam); <u>Berghuis</u> v. <u>Thompkins</u>, 560 U.S. 370, 390 (2010).

<u>The state court proceedings resulted in<br>a decision that was contrary to Strick-<br>land</u>

At issue here is the state court's invocation of a standard of law that is different from, and more stringent than, that required by <u>Strickland</u>. In the eyes of the Appellate Division, for petitioner to succeed on his ineffective assistance of counsel claim, the argument on the motion that counsel failed to make, as discussed above, must be "clear-cut and dispositive." <u>Porter</u>, 138 A.D.3d at 1148. But <u>Strickland</u> does not require that an error of counsel meet that threshold. Under <u>Strickland</u>'s framework, a habeas petitioner must demonstrate only that, but for counsel's unprofessional error, there is a "reasonable probability" that the outcome would have been different. <u>Strickland</u>, 466 U.S. at 694. And, as discussed above, the Supreme Court requires only a showing that the underlying suppression motion was "meritorious." <u>Kimmelman</u>, 477 U.S. at 375.

Indeed, that the Appellate Division's "clear-cut and dispositive" standard contradicts <u>Strickland</u> is underscored by its sole reliance upon the New York Court of Appeals

- 58 -

cases of Benevento, Baldi, and Caban, and omitting any mention of Strickland.  As the New York Court of Appeals explained in Benevento, the state law standard is more "concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case." Benevento, 697 N.E.2d at 588.  Bound to this logic, the New York Court of Appeals has "rejected ineffective assistance claims despite significant mistakes by defense counsel," because that court concluded that the counsel's "overall performance [was] adequate." People v. Turner, 840 N.E.2d 123, 126 (N.Y. 2005).

Accordingly, where the Appellate Division here required something -- a "clear-cut and dispositive" suppression motion -- that the Supreme Court does not, see Kimmelman, 477 U.S. at 375 (requiring a "meritorious" motion), its ruling violated the principle that a state court may not base its ruling on subsidiary findings that contradict Supreme Court jurisprudence.  See Early, 537 U.S. at 8.

Because the Appellate Division failed to apply the governing standard as articulated by the Supreme Court, its decision is contrary to clearly established federal law; and, therefore, this court can conduct de novo review of petitioner's Sixth Amendment claim.  See Lafler v. Cooper,

- 59 -

566 U.S. 156, 173 (2012) (state court's failure to apply Strickland to assess habeas petitioner's ineffective assistance of counsel claim was contrary to clearly established federal law and, thus, the habeas court "can determine the principles necessary to grant relief").

<u>Alternatively, the state court's decision was an unreasonable application of Strickland</u>

A decision unreasonably applies clearly established law if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Williams v. Taylor, 529 U.S. at 413. The Second Circuit has understood this to mean that while some increment of incorrectness beyond error is required, "the increment need not be great; otherwise habeas relief would be limited to state court decisions so off the mark as to suggest judicial incompetence." Monroe v. Kuhlman, 433 F.3d 236, 246 (2d Cir. 2006).

Petitioner has demonstrated that counsel failed to present a meritorious argument in support of his suppression motion. It is a given that defense counsel has an "overarching duty to advocate the defendant's cause. Strickland, 466 U.S. at 688. It follows that counsel "must

subject the prosecution's case to meaningful adversarial testing." U.S. v. Cronic, 466 U.S.648, 659 (1984). A failure to do so "makes the adversarial process itself presumptively unreliable." Id.

When an attorney, because of his ignorance of the law fails to assert the proper grounds to support a suppression motion which, in a possession case, would have resulted in the suppression of all the physical evidence seized by the police and used against the defendant at trial, the rejection of an ineffectiveness claim based upon such malfeasance cannot be viewed as objectively reasonable. See Hinton v. Alabama, ___ U.S. at ___, 134 S.Ct. at 1089 (a lawyer's "ignorance of a point of law that is fundamental to his case combined combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland"); Kimmelman, 477 U.S. at 385 (counsel's performance deficient where he failed to conduct pretrial discovery based upon mistake of law); accord Cornell v. Kirkpatrick, 665 F.3d 369, 380 (2d Cir. 2011) ("trial counsel's failure to object to [improper] venue constituted objectively unreasonable performance").

Conclusion

In summary, the Appellate Division based its rejection of petitioner's ineffective assistance of counsel claim upon a standard of law that was diametrically opposite to that employed by the Supreme Court in a similar circumstance. See Kimmelman, 477 U.S. at 375. Therefore, its decision was "contrary to … clearly established federal law, as determined by the Supreme Court of the United States" and this Court may accord de novo review to the State courts determination. 28 U.S.C. §2254(d)(1).

In any event, the Appellate Division made an objectively unreasonable decision when it overlooked counsel's failure to advance a meritorious argument that would have resulted in the suppression of all the physical evidence. Consequently, even under a deferential standard of review, the State court's determination "involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d)(1).

Where petitioner has demonstrated that his continued incarceration results from a deprivation of his Sixth Amendment right to the effective assistance of counsel, this Court should issue the writ. See 28 U.S.C. §2254(a).

- 62 -

Alternatively, should this Court deny petitioner's application, it should nevertheless issue a Certificate of Appealability.  To obtain a Certificate of Appealability, a habeas corpus petitioner "need only demonstrate 'a substantial showing of the denial of a constitutional right.'" Miller-El v. Cockrell, 537 U.S. 322, 327 (2003), quoting 28 U.S.C. §2253(c)(2).  A petitioner makes such a showing when "reasonable jurists would find that the district court's assessment of the constitutional claims debatable or wrong."  Tennard v. Dretke, 542 U.S. 274, 282 (2004), quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. at 327.  At the very least, petitioner has met that standard and, thus, merits a Certificate of Appealability.

WHEREFORE, this court should grant petitioner's application for a writ of habeas corpus; alternatively, it should issue a Certificate of Appealability.

Respectfully submitted,

_____/S/_____
STEVEN BERKO (SB7713)
Attorney for Petitioner
THE LEGAL AID SOCIETY
Criminal Appeals Bureau
199 Water Street
New York, N.Y. 10038
(212) 577-3904

December 22, 2017